Member's years and months of Continuous Service from his or her Employment Date to his or her Termination Date, as applicable, rounded down to the nearest whole number, except that if the Member terminates employment under the Long Term Disability Plan, the Member will be deemed to have at least 55 points as of his or her Termination Date, regardless of the Member's actual total points.

Section 6.3.    Code Section 417(e) Restrictions{ TC }.    Reduction of a Member's Accrued Benefit for commencement on an Annuity Starting Date before the Member's Normal Retirement Date may not result in a present value of the Member's Accrued Benefit less than determined by applying the Applicable Mortality Table indicated in Section 9.1(b), and the three-month rolling average of the annual rate of interest on 30-year Treasury securities (as described in Code Section 417(e)(3)) for the third, fourth, and fifth months preceding the month of the Member's Annuity Starting Date.

# ARTICLE VII.
## Forms of Retirement Income{ TC }

<u>Section 7.1.</u>     <u>Normal Form of Retirement Income</u>{ TC }.

(a)     <u>Married Members</u>.  The normal form of retirement income payable to a Member who is married on his or her Annuity Starting Date will be a joint and survivor annuity which is the Actuarial Equivalent of his or her Normal Retirement Income, determined under Article V (and Article VI, if applicable) and which provides for 50% of such reduced pension payable to the Member during his or her lifetime to continue after his or her death to his or her spouse.

    (1)     Each Member to which this Section 7.1(a) applies will be furnished a written explanation in nontechnical language of the terms and conditions of such form of retirement income, as well as the financial effects of such form on his or her Normal Retirement Income.  Such information will be furnished within a reasonable time before the Member's Annuity Starting Date.

    (2)     During the 90-day period preceding the Member's Annuity Starting Date, the Member may reject the normal form of retirement income by electing an optional form of retirement income, described in Section 7.2. Such an election must be made in writing on a form prescribed by the Company, and accompanied by Spousal Consent.  Upon request the Member will receive from the Company such specific additional information as may be necessary to demonstrate the financial effect of such election. The written explanation to which Section 7.1(a)(1) of the Plan refers may be provided after the Annuity Starting Date.  The 90-day applicable election period to waive the joint and survivor annuity described in Section 7.1(a)(1) of the Plan shall not end before the 30th day after the date on which such explanation is provided.  In no event shall the written explanation precede the Annuity Starting Date by a period of time greater than the Secretary of Treasury may by regulations prescribe.  A Member may elect (with any applicable spousal consent) to waive any requirement that the written explanation be provided at least 30 days before the Annuity Starting Date (or to waive the 30-day requirement referred to above) if the distribution commences more than 7 days after such explanation is provided.

    (3)     A Member may revoke any such election and make another election before his or her Annuity Starting Date on a form prescribed by the Company for such purpose and accompanied by Spousal Consent. The number of revocations and elections will not be limited.

(b)     <u>Unmarried Members</u>.  The normal form of retirement income payable to a Member who is not married on his or her Annuity Starting Date will be a straight life annuity which is the Actuarial Equivalent of the Normal Retirement Income determined under Article V (and Article VI, if applicable). An unmarried Member may elect an optional form of retirement income described in Section 7.2 during the 90-day period preceding his or her Annuity Starting Date.

Section 7.2.    Optional Forms of Retirement Income{ TC }.  In lieu of the normal form of Retirement Income provided under Section 7.1, a Member who retires on his or her Normal Retirement Date or Optional Early Retirement Date or who terminates employment on a Termination Date and whose Retirement Income Annuity Starting Date is after May 1, 2001, or who is a Covered Employee, may elect, subject to the provisions of this Article VII and of Article VIII, to receive one of the following optional forms, each of which is the Actuarial Equivalent of the Member's Normal Retirement Income as determined under Article V (and Article VI, if applicable).

(a)    Straight Life Annuity Option.   A married Member may elect to receive his or her retirement income monthly during his or her life, ceasing upon his or her death.

(b)    Uniform Income Option.  If a Member's Annuity Starting Date is before the earliest date on which he or she is eligible to receive social security benefits under the Social Security Act, the Member may have the amount of his or her retirement income payments actuarially adjusted to provide for larger monthly payments until the earliest date on which he or she may be eligible to receive social security benefits, such payments to be reduced after that date by the estimated monthly Primary Insurance Amount under the Social Security Act that he or she would be eligible to receive on such date, in order to produce so far as practicable a uniform amount of monthly retirement income from Retirement Date throughout his or her lifetime.

(c)    Alternate Options.  A Member may elect one of the following Alternate Options:

(1)    Life Income Option with Five Years Certain;

(2)    Life Income Option with Ten Years Certain;

(3)    Life Income Option with Fifteen Years Certain.

Under Alternate Option (1), (2), or (3), the Member's Normal Retirement Income will be changed to a reduced amount of income payable monthly throughout the Member's lifetime. If his or her death should occur before payments have been made for the certain period elected, such payments will be continued to his or her Beneficiary for the balance of the certain period.  In lieu of receiving such payments on an installment basis, the Beneficiary may elect to receive their value, discounted at interest, in a lump sum, provided there is no living successor Beneficiary designated by the Member.

(4)    Cash Option.  Under Alternate Option (4), the Normal Retirement Income will be changed to and paid in a single sum amount if the Member:

(i)    Has at least 10 years of Vesting Service and retires directly from employment as an Employee or Transferred Employee on his or her Normal Retirement Date, or on an Optional Early Retirement Date at age 55 or older, in which case the Member may elect the Cash Option to be paid on the actual date of his or her retirement; or

(ii)    Is a Covered Employee, in which case the Member may elect the Cash

Option to commence on the Annuity Starting Date he or she selects after attaining age 50, but not later than his or her Normal Retirement Date.

(5)     Plan-to-Plan Transfer Option.  Before April 1, 1999, under Alternate Option (5), the Normal Retirement Income will be changed to a single sum amount and the Member's Pension Contributions will be distributed to him or her in a single cash payment. The remainder will be transferred on behalf of the Member to the Star Enterprise Thrift Plan on or as soon as practicable following the Member's Retirement Date.

(6)     Joint and Survivor Annuity Option.  Under Alternate Option (6), the Normal Retirement Income will be changed so as to provide a reduced monthly income payable to the Member during his or her life and a monthly income payable after his or her death to a surviving designated Beneficiary so long as the Beneficiary may live.  The amount of each such payment to the Beneficiary will be equal to a percentage specified by the Member, not exceeding 100%, of the amount of the Retired Member's reduced retirement income.

Notwithstanding anything to the contrary herein, Alternate Options (4) and (5) above shall be available to any Member who (i) retired on any Early Retirement Date during the period commencing on July 1, 1998, and ending on July 1, 1999; (ii) received separation pay benefits under the Star Enterprise Separation Pay Plan due to the formation of the Alliance Companies, and (iii) signed an appropriate release, subject to the terms of settlement agreement under <u>Smith et al. v. Texaco et al.</u>

<u>Section 7.3.</u>    <u>Actuarial Factors</u>{ TC }.  For purposes of calculating an optional form under Section 7.2, the Member's Normal Retirement Income calculated under Article V and payable on the Member's Normal or Optional Early Retirement Date, as applicable, will be multiplied by the appropriate actuarial discount factor for the alternative elected by the Member.  Actuarial discount factors under the Plan will be determined by the Plan's actuary using the three-month rolling average of the annual rate of interest on 30-year Treasury securities (as described in Code Section 417(e)(3)) for the third, fourth and fifth months preceding the month in which the Member's Retirement Income is due to commence, and a mortality table.  The mortality table shall be the 1994 Group Annuity Mortality Table with weighting of 50% males and 50% females for distributions commencing after December 31, 1999 and before December 31, 2002, and  the mortality table described in Revenue Ruling 2001-62 for distributions made on or after December 31, 2002.

<u>Section 7.4.</u>    <u>Commencement of Benefits</u>.    Payment of any benefit provided under this Plan shall commence no later than the 60th day after the end of the Plan Year in which the Member has reached his Normal Retirement Date and has terminated his employment with the Employer. In the event that any Member is still employed at age 70 ½, notwithstanding anything herein to the contrary, the payment of benefits under the Plan to a Member shall be made in accordance with the following requirements and shall otherwise comply with Code Section 401(a)(9) and the regulations thereunder (including regulation section 1.401(a)(9)(2)), the provisions of which are incorporated herein by reference and summarized below:

(a)     Payment of a Member's Minimum Required Distribution ("MRD") amount shall commence not later than April 1st of the calendar year following the calendar year in which the Member attains age 70½ (the "Required Beginning Date" or "RBD");

(b)     A Member's MDR shall be calculated as though the benefit were to be distributed over the life of such Member or over the lives of such Member and a designated beneficiary (or over a period not extending beyond the life expectancy of such employee or the life expectancy of such employee and a designated beneficiary);

(c)     If distribution of the Member's MRD has begun in accordance with this Section 7.4, and the Member dies before his entire interest has been distributed to him or her, the remaining portion of such interest will be distributed at least as rapidly as under the method of distribution being used under this section as of the date of the Member's death;

(d)     If a Member dies before the distribution of the Member's interest has begun in accordance with this Section 7.4, the entire interest of the Member will be distributed within 5 years of the date of death of such Member; provided, however, that if (i) any portion of the Member's interest is payable to (or for the benefit of) a designated beneficiary, (ii) such portion will be distributed (in accordance with regulations) over the life of such designated beneficiary, and (iii) such distributions begin not later than one year after the date of the Member's death or such later date as the Secretary of Treasury may by regulations prescribe, for purposes of this section, the portion referred to in (i) above shall be treated as distributed on the date on which such distributions begin; provided further, however, that if the designated beneficiary referred to in (i) above is the surviving spouse of the Member, the RBD of the spouse shall not be earlier than the date on which the Member would have attained age 70 ½, and if the surviving spouse dies before the distributions to such spouse begin, this section shall be applied as if the surviving spouse were the Member.

(e)     Any distribution required to be made under the minimum distribution incidental benefit requirements of regulation section 1.401(a)(9)-2 shall be considered a required distribution under this section of the Plan.

(f)     Receipt of a MRD distribution shall not be deemed to be an election of any Alternate or Normal form of benefit by any Member and upon Retirement, such Member shall be entitled to make any election with respect to such benefit that such Member would otherwise be entitled to make, provided that the method of distribution is in compliance with the rules of Section 401(a)(9) of the Code and regulations thereunder.  The Member's  benefit shall be actuarially adjusted for distributions required to be made pursuant to this Section 7.4.

<u>Section 7.5.</u>    <u>Eligible Rollover Distributions</u>{ TC }.  This section applies to distributions made on or after January 1, 2002.  Notwithstanding any provision of the Plan to the contrary that would otherwise limit a distributee's election under this section, a distributee may elect, at the time and in the manner prescribed by the Plan Administrator, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

Section 7.6.    Definitions{ TC }.

(a)     Eligible rollover distribution: An eligible rollover distribution is any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's beneficiary, or for a specified period of 10 years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); a distribution which is made upon hardship of the distributee; and the portion of any distribution that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities), except to the extent that such portion is directly rolled over to a qualified trust described in Code Section 401(a) which is a defined contribution plan and which agrees to separately account for the after-tax portion of the rolled over amount, or such portion is rolled over to an individual retirement account or annuity described in Code Section 408(a) or 408(b).

(b)     Eligible retirement plan: An eligible retirement plan is an individual retirement account described in Code Section 408(a); an individual retirement annuity described in Code Section 408(b); an annuity plan described in Code Section 403(a); an annuity contract described in Code Section 403(b); an eligible plan under Code Section 457(b) maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state, that agrees to account separately for the eligible rollover distribution; or a defined contribution plan described in Code Section 401(a) that accepts the distributee's eligible rollover distribution. With respect to the portion of an eligible rollover distribution that is not includible in gross income (if it were paid to the distributee), an "eligible retirement plan" is limited to an individual retirement account or annuity described in Code Section 408(a) or 408(b), or a qualified defined contribution plan described in Code Section 401(a) that agrees to account separately for the portion which is includible in gross income and the portion which is not so includible.

(c)     Distributee: A distributee includes an Employee or former Employee. In addition, the Employee's or former Employee's surviving spouse and the Employee's or former Employee's spouse or former spouse who is the alternate payee under a Qualified Domestic Relations Order, are distributees with regard to the interest of the spouse or former spouse.

(d)     Direct rollover: A direct rollover is a payment by the Plan directly to the eligible retirement plan specified by the distributee.

## ARTICLE VIII.
## Rules and Regulations Governing Alternate Options{ TC }

<u>Section 8.1.</u>    <u>Elections</u>{ TC }.  A Member's election of an Alternate Option is subject to the following requirements:

(a)    The election must be made within the 90-day period preceding the Member's Annuity Starting Date.

(b)    The election must be in writing on a form prescribed by the Company.  If the Member is legally married, the election must be accompanied by Spousal Consent for all Alternate Options except the Joint and Survivor Annuity Option in Section 7.2(c)(6); otherwise the election will not be valid and the Member's retirement income will be payable in the normal form provided under Section 7.1.

(c)    The Alternate Option elected by the Member must comply with Code section 401(a)(9) (including the incidental death benefit rule of Code section 401(a)(9)(G)) and the regulations thereunder (including §1.401(a)(9)-2), which section and regulations are incorporated herein by reference and which will override any provisions of the Plan that are inconsistent therewith.  If it is determined that the Alternate Option elected by the Member would not comply with Code section 401(a)(9), the Member will be notified accordingly and requested to make another election.

<u>Section 8.2.</u>    <u>Effect of Elections</u>{ TC }.

(a)    When electing Alternate Option (6), the Member must specify his or her Retirement Date and designate both the Beneficiary and the percentage of retirement income to be continued to the Beneficiary.  No actual dependency will be required for the person to be designated as a Beneficiary.  Satisfactory evidence as to the Member's and the Beneficiary's ages must be furnished at the time of filing the election with the Company.  A Member who has elected Alternate Option (6) may not change his or her Beneficiary after his or her Annuity Starting Date.

(b)    All Alternate Options will become effective upon the Member's Annuity Starting Date.  In no event may an Alternate Option be cancelled after the Member's Annuity Starting Date.

(c)    If an Alternate Option is elected and the Beneficiary dies before the Member's Annuity Starting Date, the Member's retirement income will be payable in its normal form under Section 7.1.  If an Alternate Option is elected and the Beneficiary dies after the Member's Annuity Starting Date, but before the Member dies, the retirement income to the Member will continue to be paid in its reduced amount.  If an Alternate Option is elected and the Member dies before his or her Annuity Starting Date, such Option will be voided and no retirement income will be payable thereunder.

## ARTICLE IX.
## Limitation of Benefits{ TC }

<u>Section 9.1.</u>    <u>Limitation on Benefits</u>{ TC }.

(a)    <u>Limitation for This Plan</u>.  The provisions of this Section 9.1 are effective for distributions made or commencing on or after January 1, 2002.  Notwithstanding any other provision of the Plan, and not taking into account the accrued benefit attributable to the Member's Pension Contributions, the Annual Benefit payable to any Member, at any time during any Limitation Year, shall not exceed the limitations of Code Section 415 which are incorporated herein by reference.  If a Member's Annual Benefit would exceed the foregoing limitation, the Member's Annual Benefit shall be reduced first with respect to the qualified defined benefit plan maintained by the Commonly Controlled Group in which the Member most recently accrued benefits; provided, however, that a Member's Annual Benefit shall in no event be reduced below the amount allowed under the special grandfather and transition rules set forth in the Tax Equity and Fiscal Responsibility Act of 1982 and the Tax Reform Act of 1986.

(b)    <u>Annual Benefit</u>.  For purposes of this Article IX, a Member's "Annual Benefit" shall be equal to the sum of the following:

(1)    The annual retirement benefit to which the Member is entitled under this Plan, excluding any benefits attributable to the Member's Pension Contributions; and

(2)    The aggregate annual retirement benefits (if any) to which the Member is entitled under all other qualified defined benefit plans maintained by the Commonly Controlled Group, excluding any benefits attributable to the Member's employee contributions.

If an Annual Benefit (or any portion thereof) is payable in any form other than a single-life annuity or a qualified joint and survivor annuity (as defined in Code Section 417(b) and the regulations thereunder), then such Annual Benefit (or such portion) shall, for purposes of this Article IX, be converted into a single life annuity using the Applicable Mortality Table and the Applicable Interest Rate.  "Applicable Mortality Table" shall be the mortality table described in Revenue Ruling 95-6 for distributions commencing on or after January 1, 2002 and prior to December 31, 2002, and shall be the mortality table described in Revenue Ruling 2001-62 for distributions commencing on or after December 31, 2002, and "Applicable Interest Rate" shall be the three-month rolling average of the annual interest rate on 30-year Treasury securities (as described in Code Section 417(e)(3)) for the third, fourth and fifth months preceding the month of the Member's Annuity Starting Date.

(c)    <u>Adjusted Dollar Limitation for Benefits Commencing Before Age 62 or After 65</u>.

(1)    <u>At Ages 62 Though 65</u>.  The dollar limitation described in section 415(b)(1)(A) of the Code that is applicable at ages 62 through 65 shall be adjusted annually for increases in the cost of living pursuant to Code Section 415(d).

(2)    <u>After Age 65</u>. If a Member's Annual Benefit commences after age 65, the dollar limitation described in section 415(b)(1)(A) of the Code (as adjusted annually for increases in the cost of living pursuant to section 415(d) of the Code) for the particular Limitation Year shall be increased to the lesser of the actuarially equivalent annual amount determined as of such later commencement date using the factors described in (i) or (ii) below:

(i)    The factors used under the applicable plans for the particular Member to determine the amount of the increase for late commencement of the Member's Annual Benefit.

(ii)    Interest of 5% per year and the Applicable Mortality Table. To the extent that a forfeiture does not occur upon death after age 65, the mortality increment will be ignored for pre-benefit commencement mortality.

(3)    <u>Before Age 62</u>. If a Member's Annual Benefit commences prior to age 62, the dollar limitation described in Code Section 415(b)(1)(A) (as adjusted annually for increases in the cost of living pursuant to Code Section 415(d)) for the particular Limitation Year shall be reduced to the lesser of the actuarially equivalent annual amount determined as of such earlier commencement date using the factors described in (i) or (ii) below:

(i)    The factors used under the applicable plans for the particular Member to determine the amount of the reduction for early commencement of the Member's Annual Benefit.

(ii)    Interest of 5% per year and the Applicable Mortality Table. To the extent that a forfeiture does not occur upon death before age 62, the mortality decrement will be ignored for pre-benefit commencement mortality.

(d)    <u>Notice</u>. The Plan Administrator will advise an affected Member of any limitation on his or her projected Annual Benefit required by this Section 9.1.

(e)    <u>Commonly Controlled Group</u>. In applying the provisions of this Section 9.1 and of Section 9.2 below, all defined contribution plans of an Employer and defined contribution plans of all organizations in a Commonly Controlled Group which includes the Company will be considered as a single defined contribution plan and all defined benefit plans of the Employer and defined benefit plans of all such organizations will be considered a single defined benefit plan. For purposes of this Section 9.1, a Commonly Controlled Group will be determined by applying the special rules of Code Section 415(h).

(f)    <u>Limitation Year</u>. For purposes of applying Code Section 415 to the Plan, means a calendar year during which compliance with Section 415 of the Code is measured.

<u>Section 9.2.</u>    <u>Top Heavy Provisions</u>{ TC }.

(a)    If the Plan is or becomes Top Heavy in any Plan Year, the provisions of this Section 9.2 will supersede any conflicting provisions of the Plan.

(b)   For purposes of this Section 9.2, the following terms will have the meanings set forth below:

(1)   "Key Employee" means an individual who is considered a key employee under Code Section 416(i) and the regulations thereunder.

(2)   "Top Heavy Ratio" means a fraction, the numerator of which is the sum of the account balances under the aggregated defined contribution plan or plans for all Key Employees as of the Determination Date, including distributions made with respect to such employee under the applicable plan during the one (1) year period (the five (5) year period for distributions not made on account of severance from employment, death or disability) ending on the Determination Date and the present value of accrued benefits under the aggregated defined benefit plan or plans for all Key Employees as of the Determination Date, including distributions made with respect to such employee under the applicable plan during the one (1) year period (the five (5) year period for distributions not made on account of severance from employment, death or disability) ending on the Determination Date, and the denominator of which is the sum of the account balances under the aggregated defined contribution plan or plans and the present value of accrued benefits under the aggregated defined benefit plan or plans for all Members as of the Determination Date, all determined in accordance with Code Section 416 and the regulations thereunder.  For purposes of this subsection (b)(2), the accrued benefit of any Employee other than a Key Employee will be determined (A) under the method used for accrual purposes for all plans maintained by the Employer and its Affiliates, or (B) if there is no such method, as if such benefit accrued not more rapidly than the slowest accrual rate permitted under Code section 411(b)(1)(C).  For purposes of determining the Top Heavy Ratio, the value of account balances and the present value of accrued benefits will be determined as of the most recent Valuation Date that falls within or ends with the 12-month period ending on the Determination Date, except as provided in Code section 416 and the regulations thereunder for the first and second plan years of a defined benefit plan.  The account balances and accrued benefits of a Member (i) who is not a Key Employee, but who was a Key Employee in a prior year, or (ii) who has not received any compensation from any Employer maintaining the Plan at any time during the five year period ending on the Determination Date will be disregarded.  The calculation of the Top Heavy Ratio and the extent to which distributions, rollovers and transfers are taken into account will be made in accordance with Code Section 416 and the regulations thereunder.  When aggregating plans, the value of account balances and accrued benefits will be calculated with reference to the Determination Dates that fall within the same calendar year.  For purposes of calculating the present value of any accrued benefit in determining the Top Heavy Ratio, the actuarial assumptions employed will be those that are specified in the plan under consideration.

(3)   "Permissive Aggregation Group" means the Required Aggregation Group of plans plus any other plan or plans which, when considered as a group with the Required

Aggregation Group, would continue to satisfy the requirements of Code sections 401(a)(4) and 410 .

(4)     "Required Aggregation Group" means (A) each qualified plan in which at least one Key Employee participates, and (B) any other qualified plan which enables a plan in which a Key Employee participates to meet the requirements of Code sections 401(a)(4) or 410.

(5)     "Determination Date" means, for any Plan Year, the last day of the preceding Plan Year.

(6)     "Valuation Date" means the date which is used to calculate the value of account balances or accrued benefits for purposes of determining the Top Heavy Ratio. In the case of this Plan, the Valuation Date will be the Determination Date.

(7)     "Applicable Percentage" means the lesser of (A) 2% multiplied by the number of years of Vesting Service with an Employer, except that a year of Vesting Service will not be taken into account for purposes of this calculation if the Plan was not a Top Heavy Plan for the Plan Year ending during such year of Vesting Service, if the year of Vesting Service was completed in a Plan Year beginning before January 1, 1984, or to the extent the year of Vesting Service occurs during a Plan Year when the Plan benefits no Key Employees or former Key Employees, or (B) 20%.

(8)     "Average Compensation" means the Member's average annual compensation for the period of consecutive years (not exceeding five) during which the Member had the greatest aggregate compensation from an Employer. The years taken into account under the preceding sentence will be properly adjusted for years not included as Vesting Service under the Plan or not taken into account under (7) above, or if the year begins after the close of the last year in which the Plan was a Top Heavy Plan. For purposes of this Section 9.2(b)(8), annual compensation shall not exceed the 401(a)(17) Limitation.

(c)     This Plan is a Top Heavy Plan for any Plan Year if any of the following conditions exist:

(1)     if the Top Heavy Ratio for this Plan exceeds 60% and this Plan is not part of a Required Aggregation Group or Permissive Aggregation Group of plans;

(2)     if this Plan is a part of a Required Aggregation Group of plans, but not part of a Permissive Aggregation Group and the Top Heavy Ratio for the group of plans exceeds 60%; or

(3)     if this Plan is a part of a Required Aggregation Group and part of a Permissive Aggregation Group of plans and the Top Heavy Ratio for the Permissive Aggregation Group exceeds 60%.

(d)     If this Plan ever becomes a Top Heavy Plan, then the Normal Retirement Income of each Member who is not a Key Employee will be the greater of:

(1)     the Normal Retirement Income to which the Member is otherwise entitled under the provisions of this Plan without regard to this Section 9.2; or

(2)     a benefit (when expressed as a benefit payable annually in the form of a single life annuity with no ancillary benefits beginning at the Member's Normal Retirement Date) equal to the Applicable Percentage of the Member's Average Compensation.

(e)     If this Plan ever becomes a Top Heavy Plan, then the extent to which a Member has a nonforfeitable right to a Normal Retirement Income will be determined in accordance with the provisions of this Plan other than this Section 9.2 or in accordance with Section 9.2(f) below, whichever provision results in a nonforfeitable right to a greater percentage of the Member's accrued benefit under this Plan.

(f)     The Member's nonforfeitable right to a percentage of his Normal Retirement Income under this paragraph (f) will be determined in accordance with the following table:

| Years of Service | Nonforfeitable Percentage |
|---|---|
| 2 | 20% |
| 3 | 40% |
| 4 | 60% |
| 5 | 80% |
| 6 or more | 100% |

## ARTICLE X.
## Death, Termination of Employment and Change of Status{ TC }

Section 10.1.  Beneficiary{ TC }.  A Member may designate his or her Beneficiary and, except as otherwise provided in the Plan, may at any time change the Beneficiary by proper written notice to the Company.

(a)     If a Member who is legally married dies before his or her Annuity Starting Date, the Member's spouse will be deemed the designated Beneficiary unless the Member has designated a different Beneficiary under the Plan and the designation is accompanied by Spousal Consent. Spousal Consent will also be required if the Member wishes to change his or her designated Beneficiary by naming a Beneficiary who is not the Member's spouse. If no such Spousal Consent is provided, the Member's designation will be invalid.

(b)     Effective November 10, 1994, if (a) does not apply and no Beneficiary is designated by the Member or living at the time any death benefit becomes payable, then any sum that would otherwise be payable upon the Member's death will be payable to the Member's estate.

Section 10.2.  Death Before Annuity Starting Date{ TC }.

(a)     Contribution Death Benefit.  If a Member dies before his or her Annuity Starting Date, the minimum death benefit his or her Beneficiary will be entitled to receive will  equal the sum of the Member's Pension Contributions, if any, under the Plan (excluding any Pension Contributions previously paid to the Member), with interest as set forth in Section 3.5, computed as to each such contribution from the end of the Plan Year in which such contribution was made to the first day of the month in which death occurs. The Contribution Death Benefit will be paid to the Member's Beneficiary, if:

(1)     No other form of death benefit is payable to the Member's Beneficiary and provided there are Pension Contributions remaining in the Plan at the time of the Member's death, or

(2)     The Member's Beneficiary is eligible to receive another form of death benefit and elects to receive the Contribution Death Benefit, provided there are Pension Contributions remaining in the Plan at the time of the Member's death, in which case the Beneficiary will receive the Contribution Death Benefit plus a reduced normal or optional form of death benefit under the Plan, as elected by the Member's Beneficiary, or

(3)     If the Member dies after his or her Annuity Starting Date, but before receiving monthly payments totaling more than the Contribution Death Benefit, the difference between (a) the Contribution Death Benefit and (b) the sum of the monthly payments made to the Member will be paid to the Member's Beneficiary.

(b)     50% Survivor Annuity.  If a Member dies while an Employee after completing five or more years of Vesting Service or with fewer than five years of Vesting Service but after the first day of the month next following or coincident with the Member's 55th birthday,

or the Member terminates employment with the Employer on a Termination Date and his or her Annuity Starting Date is May 1, 2001, or later, the Member's Beneficiary will be entitled to receive a 50% Survivor Annuity, unless the Member's Beneficiary otherwise elects to receive the Survivor's Benefit.

(1)    Under the 50% Survivor Annuity, a monthly payment will be made to the Member's Beneficiary for his or her lifetime equal to: (A) if the Member dies after his or her earliest possible Retirement Date, 50% of the reduced pension to which the Member would have been entitled if he or she had retired and his or her pension had commenced on the day preceding his or her death, or (B) if the Member dies on or before his or her earliest possible Retirement Date, 50% of the reduced pension to which the Member would have been entitled if he or she had separated from service on the date of death, survived to his or her earliest possible Retirement Date, and died on the next day.

(2)    Monthly payments will begin on the later of (A) the first day of the month following the Member's death, or (B) the first day of the month that would have been the Member's earliest Retirement Date, unless the Member's Beneficiary elects to commence the benefit earlier, in which case the benefit will be reduced by the following percentages (adjusted for partial years):

| Age Member Would Have Attained At Time of Commencement | Percentage Reduction For Each Year in Age Range |
|---|---|
| Age 50-59 | Usual Discounts For Early Commencement |
| Age 40-49 | 5% |
| Age 30-39 | 3% |
| Age 29 or younger | 1% |

Such election may not be made retroactively. A spousal Beneficiary may elect to defer commencement of the 50% Survivor Annuity until no later than the first day of the month next following or coincident with the date which would have been the deceased Member's 65th birthday, in which case the benefit will be calculated based on the attained age the Member would have reached as of the actual date of commencement. Monthly payments to non-spouse Beneficiaries must begin within the 12-month period following the Member's death.

(3)    The 50% Survivor Annuity will be payable on the first day of each month as long as the Beneficiary lives and will end on the first day of the month in which the Beneficiary's death occurs. If total benefits paid at the date of the Beneficiary's death are less than the amount that would have been payable under 10.2(a), the excess of the amount under 10.2(a) over the total benefits paid will become payable to the Beneficiary's estate.

(4)     The 50% Survivor Annuity will be payable only if the Member has designated one person as primary Beneficiary. If the Member has designated more than one primary Beneficiary and such designation is a valid designation, the Survivor's Benefit described in (c) below will become automatically payable to the Member's joint primary Beneficiaries in lieu of the 50% Survivor Annuity unless the Contribution Death Benefit in Section 10.2(a) is chosen instead.

(5)     A Beneficiary who becomes entitled to a 50% Survivor Annuity may instead elect to receive the Contribution Death Benefit or the Survivor's Benefit.

(c)     <u>Survivor's Benefit</u>.

(1)     The Survivor's Benefit will be paid if elected in lieu of the 50% Survivor Annuity by a Member's Beneficiary entitled to receive the 50% Survivor Annuity, or if a Member who has selected the 50% Survivor Annuity has designated more than one primary Beneficiary.

(2)     The Survivor's Benefit is equal to the monthly pension which the Member would have received if the Member had been eligible to retire at the time of death and had retired with a Life Income Option with Ten Years Certain. Monthly payments will be made for 120 months, beginning on the later of:

(A)     the first day of the month following the Member's death, or

(B)     the first day of the month that would have been the Member's earliest possible Retirement Date, unless the Member's Beneficiary elects to commence the benefit earlier, in which case the benefit will be reduced by the same percentages set forth in Section 10.2(b)(2) for the 50% Survivor Annuity. An early commencement election may not be made retroactively. A spousal Beneficiary may elect to defer commencement of such benefit, but not later than the first day of the month next following or coincident with the date which would have been the deceased Member's 65th birthday, in which case the benefit will be calculated, based on the age the deceased Member would have attained if the Member had lived until the actual date of commencement. Monthly payments to a non-spouse Beneficiary must begin within the 12-month period following the Member's death.

(3)     The Survivor's Benefit will be payable on the first day of each of the 120 months including and following the date of commencement; provided that, if the Beneficiary is a trust or the Member's estate, the Survivor's Benefit will be converted to a single lump sum and paid to the trust or estate, and provided further, that the value of all remaining payments to any other non-spouse Beneficiary as of the month immediately preceding the 5th anniversary of the Member's death will be converted to a single lump sum and paid to the Beneficiary.

(4)     If the Member's designated Beneficiary dies before receiving a total of 120 monthly payments, the remaining payments will be commuted to a single lump

sum and paid to the deceased Beneficiary's estate, unless the deceased Member designated in writing that the balance of such payments be continued to another Beneficiary.

(d) <u>Post-Termination 50% Survivor Annuity</u>. Any Member who has completed five or more years of Vesting Service, or who has been determined to be disabled under the Long Term Disability Plan before becoming vested, who terminated employment before his or her Optional Early Retirement Date and whose Retirement Income Annuity Starting Date is earlier than May 1, 2001, will be given the opportunity to elect or reject the Post-Termination 50% Survivor Annuity, payable in the event of the Member's death before his or her Annuity Starting Date. The Member may change such election, prospectively, at any time by giving written notice to the Company.

(1) If a Member is eligible for and elects the Post-Termination 50% Survivor Annuity, the Member's Normal Retirement Income will be permanently reduced to reflect the cost of having the Post-Termination 50% Survivor Annuity coverage in force. The Member's Normal Retirement Income will be reduced by a percentage, as specified in the following table, for each year that such coverage is in force, based on the Member's age during each such year:

| Age of Member | Annual Reduction for Year of Coverage |
|---|---|
| 34 and Younger | .04% |
| 35 through 44 | .08% |
| 45 through 54 | .25% |
| 55 through 64 | .60% |

The Company will furnish specific information about the financial effects of electing or rejecting the Post-Termination 50% Survivor Annuity to each Member who is eligible therefore as soon as practicable after he or she has notified the Company of his or her intent to terminate employment.

(2) If a Member who elects the Post-Termination 50% Survivor Annuity dies before his or her Annuity Starting Date, such Member's Beneficiary will be entitled to receive a monthly payment equal to 50% of the reduced pension benefit the Member would have received had the Member separated from service on the date of death, survived to the earliest possible Retirement Date, and died the next day. Monthly payments will commence at the same time (with the same reductions) and be paid in the same manner as set forth in Section 10.2(b)(2) and (3) for the 50% Survivor Annuity. If total benefits paid at the date of the Beneficiary's death are less than the amount that would have been payable under 10.2(a), the excess of the amount under 10.2(a) over the total benefits paid will become payable to the Beneficiary's estate.

(3) If a Member who is eligible to elect the Post-Termination 50% Survivor Annuity fails to make an election upon termination or if a Member who is legally married

rejects the Post-Termination 50% Survivor Annuity without Spousal Consent, the Post-Termination 50% Survivor Annuity will be payable automatically to the Member's spouse or, in the case of an unmarried Member, to the Member's Beneficiary, and the Member's Normal Retirement Income will be permanently reduced in accordance with the table set forth above to reflect the cost of the Post-Termination 50% Survivor Annuity.

(4)     If a Member who is eligible for but rejects the Post-Termination 50% Survivor Annuity upon termination of employment dies before his or her Annuity Starting Date, such Member's Beneficiary will be entitled to receive the Contribution Death Benefit pursuant to Section 10.2(a) above, and no other death benefits will be payable under the terms of the Plan.

(5)     If the Member is not eligible to elect the Post-Termination 50% Survivor Annuity because the Member's Annuity Starting Date is May 1, 2001, or later, Section 10.02(b) will apply.

Section 10.3.   Death After Annuity Starting Date{ TC }.   Except as set forth below, if a Retired Member dies after his or her Annuity Starting Date, his or her Beneficiary will be entitled to a death benefit in the amount by which the sum of the Member's Pension Contributions, if any (excluding any Pension Contributions previously paid to him or her), with interest as set forth in Section 3.5, computed as to each such contribution from the end of the Plan Year in which such contribution was made to his or her Retirement Date, exceeds the total amount of the retirement income payments which have been paid to the Member.

(a)     If Alternate Option (6) has become effective, the death benefit, if any, will become payable after the death of the Retired Member and after all payments pursuant to the Option have been made.  In determining the amount of the death benefit, any retirement income payments which will have become due to the designated Beneficiary will be added to the retirement income payments which will have become due to the Member.

(b)     If the Member dies after Alternate Option (1), (2), or (3) has become effective, no single death benefit will become payable in accordance with this Section 10.3.

Section 10.4.   Termination of Employment{ TC }.   A Member who terminates employment before his or her Optional Early Retirement Date may elect to receive the amounts set forth in (a) or (b) below, as applicable, provided that if the Member makes an election under (a)(2) or (b)(2), he or she must repay the withdrawn amount as provided in Section 3.4(d) to restore the portion of his or her Retirement Income forfeited with respect to such withdrawal:

(a)     A Member who terminates before completing five years of Vesting Service and has not been determined to be disabled under the Long Term Disability Plan may elect:

(1)     To receive his or her Accrued Benefit attributable to his or her Pension Contributions to the Plan, plus interest, in the normal form of payment as provided in Section 7.1, beginning on his or her Annuity Starting Date, based on his or her Accrued Benefit as of the date that would have been the Member's Normal Retirement Date and calculated in the same manner as the Annuity

Reduction Amount under Section 5.2(e), but with reference to Member's Contributions not withdrawn; provided, however, that if the Member withdrew his or her Pension Contributions with interest to the Plan before his or her Annuity Starting Date or did not make Member Contributions to the Plan, the Member will not be entitled to receive any Retirement Income under the Plan.

(2)     With Spousal Consent, where applicable, to receive a single cash payment equal to an amount determined under Section 3.4(a). By election of a cash payment, the Member will forfeit all retirement income, except that he or she will be entitled to receive at his or her Normal Retirement Date Retirement Income determined under (1) above with respect to any Pension Contributions not withdrawn.

(b)     A Member who terminates after completing five or more years of Vesting Service, or who has been determined to be disabled under the Long Term Disability Plan, may elect:

(1)     To receive, commencing on his or her Normal Retirement Date, the Normal Retirement Income calculated under Article V (reduced by a percentage specified in Section 10.2(d), if applicable), commencing on his or her Normal Retirement Date or on any earlier permissible Annuity Starting Date in the normal form of payment or any permissible Optional Form of Payment provided in Section 9, or

(2)     To receive his or her Pension Contributions under Section 3.4, at any time before his or her Annuity Starting Date, and reduced Retirement Income in the normal form of payment or any permissible Optional Form of Payment provided in Section 9, commencing on his or her Normal Retirement Date or on any earlier permissible Annuity Starting Date.

(c)     A Member may, in lieu of having Retirement Income commence at his or her Normal Retirement Date, elect in writing to have Retirement Income commence on the first day of any month following the Employer's receipt of the election and coincident with or subsequent to the date that would have been the Member's Optional Early Retirement Date pursuant to the provisions of the Plan in effect on the Member's Termination Date.

(1)     The monthly Retirement Income to a Member who is not a Covered Employee and who terminates for reasons other than disability under the Long Term Disability Plan will be equal to the Retirement Income payable at his or her Normal Retirement Date, described above, reduced by a percentage determined in accordance with the following table, based upon the number of months by which the Member's Annuity Starting Date precedes the Member's Normal Retirement Date, as follows:

| Age | Percentage Reduction for Each Month in the Indicated Age Range |
|---|---|
| 60-64 | .60% |
| 50-59 | .35% |

Retirement income will be payable 1) in the normal form of payment, or, with spousal consent, in any permissible optional form in Section 7.2 provided the Member's Annuity Starting Date is May 1, 2001, or later, or, (2) for Annuity Starting Dates before May 1, 2001, , in the form described in Section 7.1 or in an optional form, if elected, described in Section 7.2(a) or (b), or effective January 28, 1993, for unmarried Members, in the form of a 50% joint and survivor annuity. Such election must be made within 90 days preceding the Member's Annuity Starting Date, and will be subject to the provisions of Article VIII.

(2)    The monthly retirement income to a Member who has been determined to be disabled under the Long Term Disability Plan will be equal to the retirement income payable at his or her Normal Retirement Date, described above, reduced by a percentage determined in accordance with Article VI. Retirement income will be payable commencing on the Member's actual Retirement Date in the (1) normal form of payment, or, with spousal consent, in any permissible optional form in Section 7.2 provided the Member's Annuity Starting Date is May 1, 2001, or later, or, for earlier Annuity Starting Dates, in (2) the form described under Section 7.1 or, if elected, in the form of Alternate Option (1), (2), (3), or (6) described in Section 7.2(c). Such election must be made within 90 days preceding the Member's Annuity Starting Date, and will be subject to the provisions of Article VIII.

(d)    The monthly retirement income to a Member who is a Covered Employee will be equal to the retirement income payable at his or her Normal Retirement Date, described above, adjusted for earlier commencement as provided in Section 6.2(B).

<u>Section 10.5.</u>   <u>Change in Employment Classification</u>{ TC }.

(a)    If a Member ceases to be an eligible Employee while remaining in the employ of the Company, a Subsidiary or an Affiliate, or while on an Approved Absence, the following will apply:

(1)    The Member will retain Benefit Service credited under the Plan but will not earn any additional Benefit Service unless and until he or she again becomes an eligible Employee.

(2)    The Member will continue to be credited with Vesting Service.

(b)    If an Employee who is a Member in the Group Pension Plan becomes eligible for Membership in this Plan, such Member will be immediately eligible to make Pension Contributions to this Plan pursuant to Section 3.2, subject to the provisions of Sections 3.3 and 3.4(b) of the Group Pension Plan which address the suspension or withdrawal of pension contributions thereunder.

(c)    If a Member transfers to Texaco or Saudi Aramco, Credited Service will include subsequent service with Texaco or Saudi Aramco, as applicable. For Members who transfer to Texaco or Saudi Aramco, Star Enterprise will calculate the Member's retirement benefits under this Plan upon retirement or termination from Texaco or Saudi

Aramco (termination does not mean transfer to or among Texaco, Saudi Aramco, or Star Enterprise) based upon (1) Benefit Service under this Plan; (2) the benefit formula, in effect at the time of transfer, of this Plan, and (3) Average Monthly Pay under this Plan but using the transferee's salary and/or salary history at the time of retirement or termination from Texaco or Saudi Aramco.

(d)    Notwithstanding anything herein to the contrary, if a Member transferred to Texaco Chemical Company and then transferred to Huntsman Corporation and retires from Huntsman Corporation, the years of service with Huntsman Corporation and the age of the Member when he retires from Huntsman will be used for determining the Member's benefit under the Plan, but the benefit will be based upon the Benefit Service with the Employer (including any Credited Service with a Texaco company prior to January 1, 1989) and Average Monthly Pay with Texaco Chemical Company as of April 30, 1994.

## ARTICLE XI.
## Effect of Other Retirement Plans or Law{ TC }

Section 11.1.  Effect of Other Retirement Plans Where Benefits Are Provided in United States Dollars{ TC }.  Anything in this Plan to the contrary notwithstanding, if any Member becomes covered by any other primary retirement program toward which the Employer contributes directly or indirectly, and which becomes applicable to the Employer after the Effective Date, the Member's compensation and Benefit Service for purposes of this Plan will be deemed to be zero while he or she is so covered.  Any retirement income under this Plan which is provided by Employer contributions and to which he or she would be otherwise entitled hereunder will be reduced by the amount of any retirement income payments to which he or she is entitled as a result of Employer contributions toward such other retirement plan and which are related to the same period of employment with the Employer.  If none of the benefits under such other plan is based on or directly related to the period of employment with the Employer before the date he or she became a Member in or eligible for coverage under such other plan, and provided such benefits are computed without regard to annual accrual of benefits, then a portion of the benefits under such other plan to which the Member becomes entitled, or would become entitled if he or she were to make application therefor, will, for the purpose of this Section, be deemed to be related to such period of employment and such reduction will be determined by multiplying such total benefits under such other plan by the ratio of (a) the period of employment with the Employer before the date he or she becomes a participant in or eligible for coverage under such other plan to (b) the period of employment under (a) hereinabove, plus the period of employment thereafter for which the Employer makes contributions to such other plan by reason of employment of said Member.

Section 11.2.  Effect of Other Retirement Plans Where Benefits Are Not Provided in United States Dollars{ TC }.  If any Member becomes entitled to or is paid any discharge, liquidation, dismissal or severance allowance or retirement income under any law in respect of which the Employer will have directly or indirectly contributed by reason of such law, or any discharge, liquidation, dismissal or severance allowance or retirement income for any other reason, any retirement income provided under this Plan which is provided by Employer contributions and to which he or she would otherwise be entitled hereunder may, depending on the nature and purpose of such benefit, be decreased by the portion of any such payments to which he or she is entitled as a result of Employer contributions.  If such payments are other than retirement income, an equivalent rate of retirement income, determined in accordance with rules applicable in an equitable and nondiscriminatory manner, may be used as a means of effectuating such decrease.

Section 11.3.  Purpose{ TC }.  The purpose of this Article XI is to eliminate duplication of benefits from two or more sources to which the Employer contributes, and any reduction determined pursuant to the provisions of this Article XI will be made notwithstanding any other provisions contained in this Plan.  In no event will the retirement income under this Plan be reduced by this Article XI for any benefits accruing under any other plan which are provided by contributions made by the Member.

## ARTICLE XII.
## Funding Agents{ TC }

Section 12.1.    Contributions{ TC }.  All Pension Contributions made by either the Members of the Plan or the Employer, including all funds transferred from the Texaco Plan, will be paid either to the Trustee of the Plan or to an Insurance Carrier or to any combination thereof.

Section 12.2.    Investments{ TC }. The Member's or the Employer's contributions paid directly or indirectly to an Insurance Carrier will be accumulated at interest in one or more funds or invested or accumulated in a separate account, or both, under the Contracts.  The Member's or Employer's contributions paid to the Trustee will be invested and accumulated in one fund under the Trust Agreement.    Subject to the terms of the Contracts, the Insurance Carriers assume full responsibility for the investment of the funds held under the Contracts.    The Trustees and Investment Managers assume full responsibility for the custody and the investment of the funds held under the Trust Agreements and managed under the Appointment Agreements.    The Insurance Carriers have no responsibility with respect to any part of the funds under the Plan in the hands of the Trustees and managed by the Investment Managers until such time as such funds are transferred to the Insurance Carriers under the Contracts.

Section 12.3.    Successor Funding Agents{ TC }.  The Company has the right, at any time and from time to time, to designate successor and additional Trustees; to enter into any additional Trust Agreements as deemed desirable to carry out this Plan; and to amend, suspend or terminate any of the  Trust Agreements.  The Financial Manager has the right, at any time and from time to time, to designate successor and additional Investment Managers and Insurance Carriers; to enter into any additional Contracts or Appointment Agreements as deemed desirable to carry out this Plan; and to amend, suspend or terminate any of the Contracts or Appointment Agreements. The Financial Manager will, from time to time, provide for the payment of any of the contributions by the Employers and Members hereunder to any such other Insurance Carriers or Trustees and wherever provided for under a Contract or Trust Agreement to require an Insurance Carrier or Trustee to transfer funds arising from contributions pursuant to this Plan to another Insurance Carrier or Trustee.  Except as provided in Section 14.1(c), the Financial Manager will have no power to perform any such actions in a manner which will cause or permit any part of the funds accumulated pursuant to this Plan to be diverted to purposes other than for the exclusive benefit of Members, Retired Members, or Beneficiaries of deceased Members, or which will cause or permit any part of such funds to revert to, or become the property of, the Company.

## ARTICLE XIII.
## Claim Procedures{ TC }

Section 13.1.   Claim Procedures{ TC }.   In order for a Member or Beneficiary to receive any type of distribution from the Plan, the Member or Beneficiary must complete the appropriate form or forms prescribed by the Company.  Such form or forms will be processed upon receipt by the Company, and benefits will be paid in accordance with the provisions of the Plan.  In the event the applicant does not receive a distribution from the Plan when due, or if the applicant does not agree with a matter pertaining to his or her benefits under the Plan, the applicant may submit a written claim to the Benefits Center of Texaco Inc. in Bellaire, Texas until June 30, 2002, and thereafter to the Star Enterprise Retirement Plan, c/o ChevronTexaco Corporation, P.O. Box 5067, San Ramon, California 94583-0967.  The applicant will be notified in writing of the decision within 90 days after the written claim is received (or 180 days if it is a special case).

Section 13.2.   Appeals{ TC }.   If a claim for benefits is denied in whole or in part, the Member or Beneficiary will be notified in writing.  The written notice shall set forth, in a manner calculated to be understood by the applicant, specific reasons for the denial, specific references to the Plan provisions on which the denial is based, a description of any information or material necessary to perfect the application, an explanation of why such material is necessary, and an explanation of the Plan's review procedure, including an explanation of the applicant's right to initiate a lawsuit under ERISA Section 502(a) if the applicant's appeal is denied.  Within a period of 60 days after receipt of such notification, the Member or Beneficiary may appeal such denial in writing to the Plan Administrator. If the Member or Beneficiary does not appeal within this 60 day period, the denial will be considered final, binding and conclusive.  The Plan Administrator will review the facts of the case and will have the discretionary authority to make a final and conclusive determination of the claim. Such determination will be issued in writing within 60 days after receipt of the written appeal (or within 120 days if special circumstances require an extension of time for processing).  The Plan Administrator shall give prompt, written notice of the decision to the applicant.  In the event that the denial of the application for benefits is affirmed in whole or in part, such notice shall set forth, in a manner calculated to be understood by the applicant, the specific reasons for such denial, specific references to the Plan provisions on which the decision is based, a statement that the applicant (or the applicant's duly authorized representative) has the right to review all pertinent documents (other than legally privileged documents), and an explanation of the applicant's right to initiate a lawsuit under ERISA Section 502(a).

Section 13.3.   Limitations on Filing Lawsuits{ TC }.   Unless federal or state law provides a shorter period of time, a Member or Beneficiary may not sue on any claim arising under this Plan after two years from the date of loss upon which the lawsuit is based.

## ARTICLE XIV.
## Amendment, Merger or Termination of Plan{ TC }

Section 14.1.    Modification, Suspension, Amendment, Termination or Discontinuance of Plan or Contract{ TC }.  While the Company hopes to continue making sufficient contributions to carry out the provisions of this Plan, it will not be under any obligation or liability whatsoever to continue contributions or to maintain this Plan indefinitely.

(a)    The Company, in its sole and absolute discretion, reserves the right, at any time and from time to time, to suspend or discontinue its contributions or to modify, suspend, amend, or terminate this Plan in whole or in part (including the provisions relating to contributions), provided, however, that the Company will have no power to perform any such actions in a manner which will cause or permit any part of the funds accumulated pursuant to this Plan to be diverted to purposes other than for the exclusive benefit of Members, Retired Members, or Beneficiaries of deceased Members, which will cause or permit any part of such funds to revert to, or become the property of, the Company until all obligations under the Plan have been met, or which will reduce the amount of retirement income or other benefits theretofore accrued to any Member, Retired Member, or Beneficiary of any deceased Member.  The authority to suspend or discontinue contributions or to modify, suspend, amend or terminate this Plan in whole or in part rests with the Star Enterprise Management Committee who may undertake such action pursuant to any method used by the Management Committee to conduct business, including, but not limited to, (i) unanimous consent resolution, (ii) resolution adopted by a majority of the Management Committee at a regular or special meeting, or (iii) minuting the action in the minutes of the Management Committee's regular or special meeting.    Notwithstanding the Management Committee's authority to amend or terminate the Plan, any officer of the Company or the Plan Administrator may execute any document which will establish the Transfer Date to which Section 17.1 of the Plan refers, make any additional amendments to the Plan that may be necessary to effectuate the partial cessation of benefits to which Article XVI refers.  In addition, the Plan Administrator has the authority to approve any amendments to the Plan where the amendments are (i) required by federal or state legislation or regulations, or (ii) required by an Internal Revenue Service ("IRS") reviewing agent in connection with a tax audit, determination letter request or compliance application made to the IRS, and necessary for the Plan to retain its qualification under Section 401(a) of the Code.

(b)    In the event of a termination or partial termination of the Plan at any time, all accrued benefits of affected employees will be nonforfeitable and fully vested; provided, however, that the funds held pursuant to this Plan will constitute the sole source of payment of benefits under the Plan and under no circumstances will the Company be liable for pension payments except in accordance with Title IV of ERISA.    Upon termination or partial termination of the Plan, the funds held pursuant to this Plan will be allocated and applied as determined by the Company consistent with Title IV of ERISA and will be administered and distributed at such time or times as is determined by the Company.

(c)    In the event there are assets remaining in the Plan after all allocations and applications have been made to the fullest extent under Title IV of ERISA, such remaining assets will be paid to the Company once all such obligations of the Plan have been satisfied.

Section 14.2.    Top-25 Restriction{ TC }.    The annual payments to any Top-25 Employee (as described in (b)) are restricted to an amount equal to the payments that would be made on behalf of the Member under a single life annuity that is the Actuarial Equivalent of the sum of the Member's accrued benefit and his or her other benefits under the Plan.

(a)    This restriction does not apply, however, if:

    (1)    After payment to a Member described in (b) of all benefits described in (c), the value of Plan assets equals or exceeds 110% of the value of current liabilities, as defined in Code section 412(l)(7), or

    (2)    The value of the benefits described in (c) for a Member described in (b) is less than 1% of the value of such current liabilities.

(b)    Top-25 Employees. The Members whose benefits are restricted on distribution include all highly compensated employees and highly compensated former employees (see (d)), subject to the limitation of the next sentence. In any one year, the total number of Members whose benefits are subject to restriction under this Section are limited to the group of 25 highly compensated employees and highly compensated former employees with the greatest compensation.

(c)    "Benefit" Defined.  For purposes of this Section, "benefit" includes loans in excess of the amounts set forth in Code section 72(p)(2)(A), any periodic income, any withdrawal values payable to a living employee, and any death benefits not provided for by insurance on the employee's life.

(d)    Highly Compensated. The term "highly compensated" has the meaning given that term by Code section 414(q).

(e)    Other Exceptions. The provisions of this Section 14.2 do not apply if the Commissioner of the United States Internal Revenue Service determines that such provisions are not necessary to prevent the prohibited discrimination that may occur in the event of an early termination of the Plan.

Section 14.3.    Merger of Plans{ TC }.    The Plan may not merge or consolidate with, or transfer its assets or liabilities to, any other plan unless each Member in the Plan would (if the Plan had then been terminated) receive a benefit immediately after the merger, consolidation, or transfer which is not less than the benefit he or she would have been entitled to receive immediately before the merger, consolidation, or transfer (if the Plan had then been terminated).

## ARTICLE XV.
## Administration, Fiduciaries and Allocation of Responsibilities{ TC }

Section 15.1.    Fiduciaries{ TC }.

(a)    The following persons will be fiduciaries under the Plan and will be the only fiduciaries hereunder.

    (1)    Named Fiduciaries with Respect to Control or Management of Plan Assets:

        (A)    Financial Manager
        (B)    Trustees
        (C)    Insurance Carriers
        (D)    Investment Managers
        (E)    Company

    (2)    Named Fiduciary with Respect to Plan Administration:  Plan Administrator.

(b)    Whenever there is a change in the name of the person occupying the position of Plan Administrator or Financial Manager, the Secretary of the Company will advise each Trustee, Insurance Carrier and Investment Manager in writing of the name of such person, as applicable, and the Trustee, Insurance Carrier, and Investment Manager may assume that such person will continue in office until advised differently in the same manner.  Whenever any Trustee, Insurance Carrier or Investment Manager must or may act upon the direction or approval of the Plan Administrator or the Financial Manager, the Trustee, Insurance Carrier or Investment Manager may act upon written communication signed by the Plan Administrator or Financial Manager, or if any agent is appointed in writing by such person to act in the Plan Administrator's or the Financial Manager's behalf, the Trustee, Insurance Carrier or Investment Manager may act upon written communication signed by such agent, and the authority of any such agent will be deemed to continue until revoked in writing.

Section 15.2.    Allocation of Fiduciary Responsibilities{ TC }.

(a)    Financial Manager:  The Financial Manager will have responsibility to manage and control the assets of the Plan in accordance with the terms of the Plan, the Trust Agreements, Contracts and Appointment Agreements, including, without limiting the generality of the foregoing, the authority:

    (1)    to coordinate the activities of the Trustees, Insurance Carriers, and Investment Managers;

    (2)    to implement and monitor the funding policy set forth in Article XII of the Plan;

    (3)    to issue directions to the Trustees, Insurance Carriers, and Investment Managers;

(4)  to appoint and retain Insurance Carriers and Investment Managers under the funding arrangements adopted in connection with the operation and administration of the Plan;

(5)  to require the Trustees, Insurance Carriers, and Investment Managers to submit reports as deemed necessary in the circumstances and to provide for audits of the records of the Trustees, Insurance Carriers, and Investment Managers as required;

(6)  to designate other persons to assist in the performance of his or her fiduciary responsibilities; and

(7)  to perform all remaining functions with respect to the control or management of assets of the Plan to the extent such functions have not been delegated under the Trust Agreements, Contracts and Appointment Agreements or reserved to the Company.

(b)  Plan Administrator:  The Plan Administrator has complete responsibility for the administration of the Plan. The Plan Administrator will have final discretionary authority to interpret and construe the terms of the Plan, to resolve any ambiguities therein, and to determine all questions relating to the Plan, including eligibility for benefits. All actions or determinations of the Plan Administrator will be final, conclusive and binding on all persons. In addition, the Plan Administrator is authorized to control the operation and administration of the Plan, including the following:

(1)  all functions assigned to the Plan Administrator under the terms of the Plan;

(2)  all functions assigned to the Plan Administrator under the terms of the Trust Agreements, the Appointment Agreements and the Contracts;

(3)  the discretion to determine an individual's characterization as an Employee, including all questions relating to the eligibility of Employees to become Members or remain Members and to receive benefits under the Plan;

(4)  the determination of benefit eligibility and amount and certification thereof to the Trustee or the Insurance Carriers;

(5)  the final determination concerning claims for benefits filed pursuant to the procedure outlined in Article XIII;

(6)  the hiring of persons to provide necessary services to the Plan;

(7)  the issuance of directions to the Trustee, the Investment Managers or the Insurance Carriers to pay any fees, taxes, charges, or other costs incidental to the operation and management of the Plan;

(8)  the preparation and filing of all reports required to be filed by the Plan with any governmental agency;

(9)     compliance with all disclosure requirements imposed by state or federal law;

(10)    the payment, if required by law, of insurance premiums to the Pension Benefit Guaranty Corporation;

(11)    the payment of Members' retirement incomes under the Plan;

(12)    the maintenance of all records of the Plan other than those required to be maintained by the Financial Manager, Trustees, Insurance Carriers, and Investment Managers;

(13)    the employment of such actuarial and consulting services and the adoption of such actuarial assumptions and mortality tables as may be deemed advisable in connection with the administration of the Plan;

(14)    the performance of all remaining functions not relating to control or management of assets of the Plan to the extent such functions have not been delegated under the Trust Agreements, Contracts and Appointment Agreements or reserved to the Company; and

(15)    the establishment of reasonable procedures to authenticate and administer Qualified Domestic Relations Orders.

(c)     Trustees:   The Trustees will have exclusive responsibility for the control and management of the assets of the Plan transferred to the Trustees, as provided in the Trust Agreements, and will have no responsibilities other than those provided in the Trust Agreements.

(d)     Insurance Carriers:  The Insurance Carriers will have exclusive responsibility for the control and management of the assets of the Plan transferred to the Insurance Carriers, as provided in the Contracts, and will have no responsibilities other than those provided in the Contracts.

(e)     Investment Managers:  The Investment Managers will have exclusive responsibility for the investment and management of the assets of the Plan held by the Trustees, as provided in the Appointment Agreements, and will have no responsibilities other than those provided in the Appointment Agreements.

(f)     Company:   The Company through its Management Committee will have exclusive authority and responsibility for, but not limited to:

(1)     the approval of the Plan, including amendments to the Plan;

(2)     the appointment and retention of the Named Fiduciaries under the Plan;

(3)     the periodic review of the overall performance and condition of the Plan;

(4)    the appointment and retention of the Trustees under the funding arrangements adopted in connection with the operation and administration of the Plan; and

(5)    the approval of investment policy and guidelines, and periodic reviews of the performance of the Trustees, Insurance Carriers, and Investment Managers, based on such guidelines and information submitted by the Financial Manager.

<u>Section 15.3.</u>    <u>No Joint Fiduciary Responsibilities</u>{ TC }.  This Article XV is intended to allocate to each fiduciary the individual responsibility for the prudent execution of the functions assigned to him or her, and none of such responsibilities or any other responsibility will be shared by two or more of such fiduciaries unless such sharing will be provided by a specific provision of the Plan, Trust Agreements, Contracts or Appointment Agreements.  Whenever a fiduciary is required by the Plan, Trust Agreements, Contracts or Appointment Agreements to follow the directions of another fiduciary, such fiduciaries will not be deemed to have been assigned a shared responsibility, but the responsibility of the fiduciary giving the directions will be deemed his or her sole responsibility, and the responsibility of the fiduciary receiving those directions will be to follow them insofar as such instructions are on their face proper under applicable law.

## ARTICLE XVI.
## Miscellaneous{ TC }

Section 16.1.  Headings{ TC }.  The headings in this Plan are intended for convenience of reference only.  In the event of a conflict between a heading and the content of a section, the content of the section will control.

Section 16.2.  Construction{ TC }.  This Plan will be construed and administered in accordance with the laws of the State of New York to the extent not inconsistent with ERISA.

Section 16.3.  Right of Employee Not Augmented by Plan{ TC }.  Neither the action of the Company in establishing the Plan, nor any action taken by it or any Employer under the provisions of this Plan, nor any provisions of this Plan, will be construed as giving to any Employee of an Employer the right to be retained in its employ or the right to any retirement income or benefit beyond those provided for by this Plan and by the funds accumulated pursuant thereto.

Section 16.4.  Restrictions on Alienation and Assignment{ TC }.  No Member, Retired Member, or Beneficiary under this Plan will have the right to assign, transfer, hypothecate, encumber, commute, or anticipate his or her interest in any payments under this Plan, subject however to applicable law, and such payments will not in any way be subject to any legal process to levy upon or attach the same for payment of any claim against any Member, Retired Member, or Beneficiary, subject however to applicable law.  The foregoing nonalienation rules will apply to domestic relations orders but will not apply to Qualified Domestic Relations Orders.

Section 16.5.  Notices to Be Filed with the Company{ TC }.  Wherever provision is made herein that a Member may exercise any option or election or designate a Beneficiary, the action of such Member will be evidenced by a written notice thereof signed by him or her on a form, if any, furnished for such purpose by the Company and filed with the Company or alternatively, in any manner designated as proper and acceptable by the Plan Administrator, (including, but not limited to, electronic methods).  If the Member is legally married, such written notice must also include Spousal Consent where required by the provisions of this Plan and pursuant to applicable law.

Section 16.6.  Expenses{ TC }.  The administration expenses incident to the operation of the Plan will be paid by the Plan, unless the Company elects to pay such expenses from its general assets.

Section 16.7.  Payment of Retirement Income{ TC }.

(a)    Each monthly retirement income payment will be due and payable upon the first day of the month.

(b)    Notwithstanding any other provision of the Plan, the Plan Administrator will automatically cash out a Member's retirement income if the Actuarial Equivalent present value of such Member's retirement income upon his or her termination of employment is $5,000 or less, effective January 1, 2001 ($3,500 for Plan Years before this date) by paying such Actuarial Equivalent amount in a single lump sum.

(c)     If a Member retires, commences payments of his or her retirement income, and again becomes an Employee, payments will continue in the same amount until the Member again retires, at which time payments will cease and the Member's retirement income will be recalculated taking into account any additional Credited Service relating to the period of reemployment, and reduced (but not to less than the amount of pension previously payable) by the Actuarial Equivalent (expressed as a monthly pension payable for life and ceasing upon death) of payments previously received by the Member. The Member will then be required to make a new election pursuant to Article VII with respect to his or her recalculated retirement income.

(d)     If a Member receives a total distribution of his or her retirement income upon termination of employment and again becomes an Employee, upon subsequent termination of employment or retirement the Member's retirement income will be recalculated, and the Member will be required to make a new election, in the same manner described in subsection (c) above.

Section 16.8.    Return of Contributions{ TC }.

(a)     Notwithstanding Section 14.1, in the case of an excess contribution made:

    (1)     by a good faith mistake in fact, or

    (2)     which is not deductible under Code section 404, or

    (3)     which is made pending initial qualification of the Plan and the Plan fails to receive initial qualification;

    the excess contribution, as determined in (b) below, will be returned to the Employer within one year after the date of payment by mistake, the date of disallowance, or the date of determination of nonqualification, whichever applies.

(b)     The amount of the excess contribution will be the lesser of:

    (1)     the excess of the amount contributed over the amount that would have been contributed had said mistake or disallowance or failure to qualify not occurred, or

    (2)     the amount determined in (1) above, less any losses attributable thereto.

Section 16.9.    Legal Effect{ TC }.    Except as otherwise provided in this Plan, this Plan will govern a Member's rights only to accrued benefits earned only on or after January 1, 1989. A Member's rights to accrued benefits earned under the Texaco Plan or Saudi Aramco Plan before January 1, 1989 will be governed by the terms of the Texaco Plan or Saudi Aramco Plan, as applicable. This document is a restatement of the Plan as of January 1, 2002. Unless specified otherwise in this document, the provisions of the Plan in effect on a Member's Retirement Date or Termination Date, as applicable, will govern.

Section 16.10. Miscellaneous Provisions{ TC }.

(a)     If a Member forfeits any benefits under the Plan, such forfeiture will not affect the benefits of any other Member.

(b)     No benefits under the Plan will be distributed except for retirement, disability, or as the result of termination of employment.

(c)     Except as provided in Section 3.4 and Section 10.2, once a Member has five years of Vesting Service, his or her benefits accrued under the Plan will not be divested for any reason other than his or her death.

## ARTICLE XVII.
## Employment by Alliance Companies{ TC }

Section 17.1.  Eligibility{ TC }.  For purposes of this Article the "Transfer Date" shall be a date certified by an officer of the Company or the Plan Administrator as the date upon which substantially all Employees are transferred to Motiva Enterprises LLC, Equiva Services LLC, Equilon Enterprises LLC, Equiva Trading Company, Equilon Pipeline Company or any subsidiary or affiliate thereof (the "Alliance Companies").  Any Employee who was a Member of this Plan or who was not a Member of this Plan due to failure to satisfy the eligibility service requirements of 2.1(b) of this Plan on or before the Transfer Date and is transferred directly to an Alliance Company shall be referred to herein as an "Alliance Employee."  Any Alliance Employee who was not a Member of this Plan on or before the Transfer Date shall receive service credit for eligibility purposes for service with an Alliance Company and shall become a Member of this Plan on the date that such Alliance Employee would otherwise become a Member if such service had been performed for the Company.

Section 17.2.  Benefit Service{ TC }.  No Alliance Employee shall be credited with any Benefit Service or allowed to make any Pension Contributions under the Plan after the date of such Employee's transfer to an Alliance Company.

Section 17.3.  Vesting Service{ TC }.  Each Alliance Employee who was not one hundred percent (100%) vested in his rights to his accrued benefit under the Plan as of the date of his transfer to an Alliance Company shall be credited with Vesting Service for any period of Credited Service with an Alliance Company.

Section 17.4.  Retirement Date{ TC }.  Distributions and Optional Forms of Retirement Income. Solely, for purposes of determining (i) a Member's Retirement Date under Article IV; (ii) commencement of benefits under Article VI; (iii) forms of retirement income to which a Member is entitled under Article VII of the Plan; and (iv) benefits payable under Article X (not including crediting of any Benefit Service), an Alliance Employee's service with an Alliance Company shall be considered as service under the Plan, an Alliance Employee shall not be considered to have terminated employment while employed with an Alliance Company and an Alliance Employee's retirement or termination from an Alliance Company shall be considered retirement or termination under the Plan; provided that such retirement shall also meet the requirements set forth under this Plan.

Section 17.5.  Calculation of Alliance Employee's Retirement Benefit{ TC }.  Upon retirement or termination of employment from an Alliance Company, an Alliance Employee's retirement benefits under this Plan shall be based on (1) Benefit Service under the Plan; (2) the benefit formula under this Plan in effect at the time the Alliance Employee transferred to the Alliance Company; and (3) Average Monthly Pay under this Plan taking into account the Alliance Employee's salary history at the Alliance Company at the time of retirement or termination from the Alliance Company.

## ARTICLE XVIII.
### Execution


To record the amendment and restatement of the Plan to read as set forth herein in accordance with the authority granted to it in Section 14.1 of the Plan, ChevronTexaco Corporation, as Plan Administrator, has caused its authorized officer to execute this document on the ___ day of _____, 2002, effective as of January 1, 2002.


                              CHEVRONTEXACO CORPORATION
                                        (as                    Plan
Administrator)


                              By:_____
                                      John Bethancourt
                                Vice President, Human Resources

# APPENDIX A.

## Pay Classes{ TC \l "1"}

Section A.1.    Pay Classes{ TC \l "2"}.    The Company may establish Pay Classes with a representative rate of pay for each Class, and may alter, replace or discontinue them at any time.

(a)    Established effective January 1, 1989:

### Pay Classes

| Pay Class No. | Monthly Rate of Pay From | To | Monthly Contribution Rate |
|---|---|---|---|
| | Under $387.50 | | |
| 16 | $387.50 | $412.49 | $2.63 |
| 17 | $412.50 | $474.99 | $2.95 |
| 18 | $475.00 | $524.99 | $3.28 |
| 19 | $525.00 | $574.99 | $3.60 |
| 20 | $575.00 | $624.99 | $3.93 |
| 21 | $625.00 | $674.99 | $4.25 |
| 22 | $675.00 | $724.99 | $4.75 |
| 23 | $725.00 | $774.99 | $5.25 |
| 24 | $775.00 | $824.99 | $5.75 |
| 25 | $825.00 | $949.99 | $6.75 |
| 26 | $950.00 | $1,049.99 | $7.75 |
| 27 | $1,050.00 | $1,149.99 | $8.75 |
| 28 | $1,150.00 | $1,249.99 | $9.75 |
| 29 | $1,250.00 | $1,349.99 | $10.75 |
| 30 | $1,350.00 | $1,449.99 | $11.75 |
| 31 | $1,450.00 | $1,549.99 | $12.75 |
| 32 | $1,550.00 | $1,649.99 | $13.75 |
| 33 | $1,650.00 | $1,749.99 | $14.75 |
| 34 | $1,750.00 | $1,849.99 | $15.75 |
| 35 | $1,850.00 | $1,949.99 | $16.75 |
| 36 | $1,950.00 | $2,049.99 | $17.75 |
| 37 | $2,050.00 | $2,149.99 | $18.75 |
| 38 | $2,150.00 | $2,249.99 | $19.75 |
| 39 | $2,250.00 | $2,349.99 | $20.75 |
| 40 | $2,350.00 | $2,449.99 | $21.75 |
| 41 | $2,450.00 | $2,549.99 | $22.75 |
| 42 | $2,550.00 | $2,649.99 | $23.75 |
| 43 | $2,650.00 | $2,749.99 | $24.75 |
| 44 | $2,750.00 | $2,849.99 | $25.75 |
| 45 | $2,850.00 | $2,949.99 | $26.75 |
| 46 | $2,950.00 | $3,049.99 | $27.75 |
| 47 | $3,050.00 | $3,149.99 | $28.75 |

Pay Classes

| | Monthly Rate of Pay | | |
|---|---|---|---|
| Pay Class No. | From | To | Monthly Contribution Rate |
| 48 | $3,150.00 | $3,249.99 | $29.75 |
| 49 | $3,250.00 | $3,349.99 | $30.75 |
| 50 | $3,350.00 | $3,449.99 | $31.75 |

Pay Classes Nos. 51, 52, etc. and the benefits and contributions applicable to such Pay Classes, will be determined by adding the following to the amount applicable to the next higher Pay Class:

| Monthly Rate of Pay | Monthly Contribution Rate |
|---|---|
| $100.00 | $1.00 |

A Member may contribute only for the Pay Class in which he or she is placed according to his or her monthly Benefit Base Pay rate.  Changes in Pay Classes and resulting changes in amounts of contributions will be made on the May 1st or November 1st (whichever first occurs) following the dates of changes in pay rates; if a change in pay rate is effective on a May 1st or November 1st, the resulting Pay Class change will be made on the same date.

(b)     The rate of pay of any Member while any such Pay Classes will be applicable will, for the purpose of determining the contributions by such Member, be the representative rate of pay applicable to him or her as determined thereunder by the Employer.

(c)     Pay Classes were discontinued effective January 1, 1990.

# EXHIBIT B

# How to File a Claim

If you or your Beneficiary believes that you're entitled to a benefit from the Plan that you didn't receive, you or your Beneficiary can file a written claim for that benefit with ChevronTexaco. Address your letter as follows:

ChevronTexaco Corporation
Retirement Plan Administrator
P.O. Box 6075
San Ramon, CA 94583-0775

If you or your Beneficiary files a claim for a benefit, ChevronTexaco will send you or your Beneficiary a decision on the claim within 90 days after the claim is received. However, if there are special circumstances that require additional time, the company will advise you or your Beneficiary that additional time is needed and then will send you or your Beneficiary a decision within 180 days after the claim is received.

If the claim for a benefit is denied (in whole or in part), ChevronTexaco will send you or your Beneficiary a written explanation that includes:

- specific reasons for the denial, as well as the specific plan provisions on which the denial is based;

- a description of any additional information that could help you or your Beneficiary complete the claim and reasons why the information is needed;

- information about how you or your Beneficiary can appeal the denial of the claim;

- a statement explaining your or your Beneficiary's right to file a civil lawsuit under section 502(a) of ERISA if your or your Beneficiary's appeal is denied.

## Appeals Procedures

If a claim is denied in whole or in part and you want to appeal the denial, you or your Beneficiary must do so within 90 days after you or your Beneficiary received written notice of the denial.

The appeal must be in writing, must describe the grounds on which it's based and should include any documents, records, written comments or other information you feel will support the appeal. Before submitting the appeal, you or your Beneficiary can review and receive, at no charge, copies of plan documents, records and other information relevant to your or your Beneficiary's claim for benefits under the Plan.

The Review Panel will provide you or your Beneficiary with a written response to the appeal and will either reverse the earlier decision and provide for payment of the part of your benefit that was initially denied, or it will deny the appeal. If the appeal is denied, the response will contain:

- specific reasons for the denial and the specific plan provisions on which the denial is based;

- information explaining your or your Beneficiary's right to review and receive, at no charge, copies of plan documents, records and other information relevant to your or your Beneficiary's claim for benefits under the Plan;

- a statement explaining your or your Beneficiary's right to file a civil lawsuit under section 502(a) of ERISA.

The Review Panel doesn't have the authority to change plan provisions or to grant exceptions to plan rules.

For appeals regarding the Retirement Plan, address your written correspondence to:

Review Panel
ChevronTexaco Retirement Plan
P.O. Box 6075
San Ramon, CA 94583-0775

The Review Panel may require you or your Beneficiary to submit (at your or your Beneficiary's expense) additional information, documents or other material that it believes is necessary for the review.

You or your Beneficiary will be notified of the final determination of the appeal within 60 days after the date it's received, unless there are special circumstances that require additional time. You or your Beneficiary will be advised if more time is needed, and you'll then receive the final determination within 120 days after the appeal is received. If you or your Beneficiary does not receive a written decision within 60 or 120 days (whichever applies), you or your Beneficiary can take legal action.

## Administrative Power and Responsibilities

The Corporation has the discretionary authority to control and manage the operation and administration of the Plan. The Corporation shall have the full, exclusive and discretionary authority to prescribe such forms; make such rules, regulations, interpretations and computations; construe the terms of the Plan; determine all issues relating to participation and eligibility for benefits; and take such other action to administer the Plan as it may deem appropriate in its sole discretion. The Corporation's rules, regulations, interpretations, computations and actions shall be final and binding on all persons. Such discretionary authority can also be exercised by a delegatee.

## CERTIFICATE OF SERVICE

I, Sarah E. Diluzio, hereby certify that on May 17, 2005, I electronically filed true

and correct copies of the foregoing DECLARATION OF RHONDA ISELT IN

SUPPORT OF STAR ENTERPRISE, INC.'S MOTION TO DISMISS THE THIRD-

PARTY COMPLAINT with the Clerk of the Court using CM/ECF which will send

notification of such filing, which is available for viewing and downloading from

CM/ECF, and hand delivered two (2) copies to the following counsel of record:

David J. Ferry, Jr., Esq.
Ferry, Joseph & Pearce, P.A.
824 N. Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19801
dferry@ferryjoseph.com

Robert A. Penza, Esq.
Peter M. Sweeney, Esq.
Gordon, Fournaris & Mammarella, P.A.
1925 Lovering Avenue
Wilmington, DE 19806
rpenza@gfmlaw.com

Kevin J. Connors, Esq.
Marshall Dennehey Warner Coleman & Goggin
1220 North Market Street, 5th Floor
Wilmington, DE 19801
kconnors@mdwcg.com

Sarah E. DiLuzio (DSB ID No. 4085)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Post Office Box 951
Wilmington, Delaware  19899-0951
Tel: (302) 984-6000
E-mail: sdiluzio@potteranderson.com